UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

LONG ROCKWOOD VII, LLC, et al.,

                Plaintiffs,

vs.

ROCKWOOD LODGE, LLC, et al,

                Defendants.

Case No 2:14-cv-00318-REB

**MEMORANDUM DECISION AND ORDER**

Pending before the Court is a Motion for Summary Judgment filed by Defendants Rockwood Lodge, LLC and Rockwood Lodge II, LLC, as well as several related Motions to Strike. (Dkts. 28, 47, & 48). All parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. (Dkt. 12). Having reviewed the record and the submissions of the parties, and having heard oral argument on October 8, 2015, the Court now enters the following order.

## BACKGROUND

This case arises out of the sale of a multi-unit apartment complex in Coeur d'Alene, Idaho known as the Rockwood Lodge Apartments. The Plaintiffs are several limited liability companies who were the collective purchasers of  Rockwood Lodge. (First Amended Complaint, Dkt. 19, p. 2). The Defendants include several limited liability companies who sold Rockwood Lodge to Plaintiffs, along with another LLC that

managed the apartment complex prior to the sale, and numerous individuals who were members of the various LLCs. (*Id.* P. 3).

Though there are many parties and an extensive record, the crux of this case is relatively simple. Plaintiffs filed suit when they discovered, some years after the sale had closed, that wooden substructures in concrete deck balconies at Rockwood Lodge were rotting as a result of water seepage. Plaintiffs argue this condition constituted a hidden defect and that Defendants had a duty to disclose this hidden defect prior to the closing of the sale because Defendants had encountered similar problems  with water penetration in the decks of a nearly identical apartment complex, known as the Adirondack Lodge, that they owned and operated in Spokane, Washington. Defendants,  however, contend that they made all necessary disclosures, including a disclosure about the potential for deck water penetration on the deck balconies at Rockwood Lodge and rely further upon a provision in the sale contract stating that the property was being sold "as is."

Rockwood Lodge was built in several phases from 2001 to 2006 and operated by Defendants or their associated entities until 2011. (Plaintiff's Statement of Undisputed Facts, Dkt. 33, ¶ 3; Frank Depo., Dkt. 34-3 at p. 9 & 30).[1] In the spring of 2011, Plaintiffs and Defendants entered into negotiations for the sale of Rockwood Lodge. At the time, Defendants were also negotiating with another entity, the Wolff Company, for the sale of

---

[1] Unless otherwise indicated, specific page citations refer to the page number generated by the CMECF docketing system.

MEMORANDUM DECISION AND ORDER  -  2

the second apartment complex known as the Adirondack Lodge, located in Spokane.[2]

Although Adirondack Lodge was build several years after Rockwood Lodge (Frank depo.

Dkt. 34-3 at 14), the two apartment complexes were built using substantially similar plans

and the same contractor, Greenstone Construction, built both complexes. (Defendant's

Statement of Facts, ¶ 6). Further, the decks at both complexes had a very similar design.

(Wheaton Depo. Dkt. 34-1, p. 3).

On May 11, 2011, Plaintiffs and Defendants entered into a Commercial &

Investment Real Estate Purchase and Sale Agreement (hereafter "the Purchase and Sale

Agreement") for the Sale of Rockwood Lodge. The Purchase and Sale Agreement

included a provision called a "Feasibility Contingency" that allowed Plaintiffs a 30 day

due diligence period in which to inspect the property. This clause also gave Plaintiffs the

right of access to the property to conduct inspections, and also provided that the

Agreement would terminate unless the Buyer (i.e. the Plaintiffs) gave written notice that

the property was acceptable. *See,* Purchase and Sale Agreement, Maurer Decl., Dkt. 31-5

at p. 17-18.

The Purchase and Sale Agreement also contained an "as is" clause that provided:

Except for those representations and warranties specifically included in
this Agreement: (i) Seller makes no representations or warranties regarding
the Property, (ii) Seller hereby disclaims, and Buyer hereby waives, any and
all representations or warranties of any kind; express or implied, concerning
the Property or any portion thereof, as to its condition, value, compliance with
laws, status of permits or approvals, existence or absence of hazardous material

---

[2]  The Wolff Company is not a party to this lawsuit.

on site, occupancy rate or any other matter of similar or dissimilar nature relating to the Property, including the warranties of fitness for a particular purpose, tenantability, habitability and use; (iii) Buyer otherwise takes the Property "AS IS" and (iv) Buyer represents and warrants to Seller that Buyer has sufficient experience and expertise such that it is reasonable for Buyer to rely on its own pre-closing inspections and investigations.

*Id.* at p. 21.

Lastly, Paragraph 12 of the Purchase and Sale Agreement stated the "Seller is not aware of any concealed material defects in the property except as disclosed to Buyer in writing during the feasibility period."  This paragraph also contained the following language:

If prior to Closing Seller or Buyer discovers any information which would cause any of the representations above to be false if the same were deemed made as of the date of such discovery, then the party discovering the same shall promptly notify the other in writing. If the newly discovered information will result in costs or liability to Buyer in excess of the lesser of $100,000 or five percent (5%) of the purchase price stated in this Agreement, or will materially adversely affect Buyer's intended use of the Property, then Buyer shall have the right to terminate the Agreement and receive a refund of its earnest money.

(Martinson. Decl., Dkt. 31-5 at 21.). In essence, this language imposed on Defendants a duty to update their disclosures if, prior to disclosing, they discovered any information which made their earlier representations false.

During the period of the summer of 2011 when Plaintiffs were conducting their due diligence inspections at  Rockwood Lodge, another entity known as the Wolff Company made an offer to buy the Adirondack Lodge. Previously, the Defendants had encountered some problems with the decks at Adirondack – specifically, signs of water

MEMORANDUM DECISION AND ORDER  -  4

damage were apparent on decks at Adirondack Lodge as early as February of 2011, and

repair work was done on approximately six decks in April and June of 2011.

(Defendant's Factual Statement, Dkt. 30, ¶ 15 and Reply Brief, Dkt. 46, at p. 3-4). During

the latter half of 2011 and into 2012, maintenance staff at Adirondack Lodge worked to

apply a rubberized epoxy coating to approximately 71 decks at that complex.

(Defendant's Factual Statement, ¶ 15). On August 18, 2011, Defendants disclosed these

problems to the Wolff Company in a document entitled "Seller's disclosure of property

conditions":

> For the buyer's records; some of the major capital improvement projects we
> have completed on this property recently are listed below:
>
> • Repaired numerous elevated deck soffits that showed signs
> of damage from water penetration.

(Martinson Decl. ¶ 15.). In the spring of 2011, Defendants inspected decks at Rockwood

Lodge to see if similar damage was occurring at that complex, but identified no problems

similar to those they had found at Adirondack. (Defendants' Statement of Facts ¶ 16;

Frank Depo., Dkt. 31-1, p. 17).

In August of 2011, after being informed of the repair work on the decks at

Adirondack, an investigator acting on behalf of the Wolff Company opened at random

one of Adirondack's balcony decks in an effort to determine the extent of the damage to

those decks. This inspection revealed extensive rot in the wooden substructure of the

deck. (Plaintiff's Statement of Facts, Dkt. 33, ¶ 7;  Clark Decl., Exh. 1, Dkt. 44-1 and

Exh. 2, Dkt. 44-14, p. 1-3). After follow-up, the investigator concluded that moisture

MEMORANDUM DECISION AND ORDER  -  5

intrusion was present "on a universal basis" in the decks at Adirondack.[1] (Clark Decl. Exh. 1, Dkt. 44-1 at p. 9).

Following the discovery of the moisture/rot issues, the Woolf Company asked for a reduction in the sale price. (The record is unclear as to whether the requested reduction solely reflected concerns over the integrity of the deck substructures). (Frank depo., Dkt. 31-6, p. 20). No agreement was reached on that request, and the sale of the Adirondack complex fell through. With that background, the dispute in this case centers on the adequacy of disclosures made to Plaintiffs regarding the potential for water penetration on the decks at Rockwood Lodge, in light of Defendants' alleged knowledge of problems on similarly-designed decks at Adirondack.

Earlier in the summer, on July 1, 2011, James Frank, the manager of Rockwood Lodge LLC, drafted a letter to Winnie Long, one of the purchasers of the Rockwood Complex, that contained the following disclosure about the potential for deck water penetration:

> This letter is to inform the buyers of Rockwood Lodge LLC and Rockwood Lodge II LLC of property conditions and maintenance items.
>
> **Potential Deck Water Penetration:** This is associated with the concrete decks on the newer phase. Sealing will help prevent the possibility of water penetration through the surface of the deck. While there has been little problem to date at Rockwood Lodge, there is potential for water to penetrate and become trapped between the under surface of the deck and the bottom enclosure of the deck causing problems.

---

[1] It is not clear if the inspector's comment meant that damage was visible on the concrete *surfaces* of every balcony, or if he'd concluded that the water penetration problem had progressed to the extent where all of the *wooden* deck structures were rotting away.

(Martinson Decl., Exh. 3, Dkt. 43-13, at p. 3-4). This "disclosure" letter addressed to Ms. Long was dated July 1, but it was not sent until July 7, 2011 when it was emailed to Wayne Burton, the real estate broker for Plaintiffs, with directions for him to forward it to Ms. Long. (Defendants' Statement of Facts, Dkt. 30 at ¶ 18). In his deposition, Mr. Burton  testified that he received the disclosure letter, but before he received the letter he had received a call from Kevin Schneidmiller, who said that "they had seen some problems at Adirondack and that they are disclosing that the decks need to be sealed." (Burton Depo., Dkt. 34-5 at p. 15).[2]

The parties have a substantial disagreement about the meaning of Defendants' disclosure letter.  Plaintiffs testified that they read the disclosure letter to refer to the potential for *small* amounts of water to penetrate the concrete surface of the decks over time rather than to a structural problem that could necessitate major capital repairs. For example, Winnie Long testified that she understood the potential for water penetration into a concrete surface to be a routine issue of which anyone who managed property would be aware, equivalent to needing to repaint buildings regularly or maintain asphalt in a parking lot. (Long depo., Dkt. 31-5, p. 9). Mr. Burton also testified that when he read the disclosure letter he believed it simply referred to the need to apply a product such as Thompson's Water Seal to the decks from time to time, and that the issue was therefore not "a big deal."  (Burton Depo. Dkt. 34-5 at p. 15). Kevin McCathren, another individual

---

[2] Mr. Schneidmiller was a member of Rockwood Lodge LLC and has been named as a Defendant in this case, though the Court cannot discern from the record his specific roles in the management of Adirondack Lodge or the underlying sale of Rockwood Lodge.

MEMORANDUM DECISION AND ORDER  -  7

involved in property maintenance at Rockwood Lodge, gave similar testimony.
(McCathren depo., Dkt. 31-9, at p. 9-11).

The sale of the Rockwood Complex closed on October 1, 2011. (Plaintiff's
Statement of Facts, Dkt. 33, ¶ 8, ). For approximately two-and-a-half years after the
closing, Plaintiffs did not encounter any problems with the decks at the Rockwood
Complex. Then, in March of 2014, a maintenance worker at Rockwood noticed a sagging
soffit–a potential sign of substantial moisture penetration–underneath one of the balcony
decks. (McFarland Decl., Dkt. 40, ¶¶ 2-3). Because this issue was the outside the scope of
routine maintenance, Mr. Brown called for the assistance of Butch McFarland, who
worked for a company that oversaw property management issues at Rockwood Lodge.
Mr. McFarland attempted to examine the deck substructure while standing underneath the
deck, but could not see into the deck substructure to determine the extent of the damage.
He then used the claw end of his hammer to check on the integrity of the concrete and/or
decking substructure. The substructure turned out to be so decayed that the deck collapsed
around him. (*Id.* at ¶¶ 2-4).

After this incident, Mr. McFarland made substantial efforts to investigate whether
other balcony decks at Rockwood Lodge had similar problems with their wooden
substructures. In consultation with a structural engineer, he determined that it would be
necessary to remove the outside materials on all one hundred decks that had the same
design as the one that had collapsed. This investigation ultimately revealed damage to
sixty-seven out of one hundred decks. (*Id.* ¶ 6). This lawsuit followed.

MEMORANDUM DECISION AND ORDER  -  8

## LEGAL STANDARDS

Summary judgment is appropriate where a party can show that, as to a particular claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id. at 327.*

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment ...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). Rather, there must be no genuine dispute as to any material fact in order for a case to survive summary judgment. Material facts are those "that might affect the outcome of the suit." *Id*. at 248. Disputes over facts that are not material to the resolution of the motion will not preclude summary judgment. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other

MEMORANDUM DECISION AND ORDER  -  9

materials in the record." Fed. R. Civ. P. 56(c)(3).

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252.

## DISCUSSION

## I.    Motion to Strike Declaration of Keith Phillips (Dkt. 47).

First, the Court will take up Defendant's request to strike the declaration of Keith Phillips, a licensed real estate broker who provided an affidavit explaining various norms in the real estate industry with respect to inspections of commercial properties, including the custom of obtaining only a single capital needs assessment before closing and the relative rarity of destructive testing in conducting property inspections. (Phillips Decl., Dkt. 37). Defendants object to his testimony on the basis that he was not disclosed as an expert witness and also argue that, as a stranger to transaction between the parties, he does not qualify as a lay witness under Fed. R. Civ. Pro. 701.

The Court agrees that Mr. Phillips's connections with the underlying facts are too attenuated to qualify him as a lay witness who can testify, under Rule 701, from his observations and perceptions. Nor was Mr. Phillips disclosed as an expert before the deadline for expert witness disclosures, as required by Rule 26(a)(2)(B) and 26(a)(2)(C).

MEMORANDUM DECISION AND ORDER  -  10

The Court will therefore grant the motion, and will not consider Mr. Phillips's testimony in deciding the Motion for Summary Judgment.

## II.      Motions to Strike Benton, McFarland, and Martinson Declarations (Dkt. 48).

The Court will next consider Defendants' requests to strike portions of several other declarations that Plaintiffs have submitted in connection with their opposition brief. Broadly speaking, Defendants seek to strike the testimony of several experts or individuals who have offered either expert reports or lay opinion testimony regarding the conditions they found in the balcony decks at Rockwood Lodge, and their conclusions as to the cause and timing of the damage to those decks.

The Court concludes that the statements Defendants seek to strike are admissible, in light of the broad standards of relevance set forth in Rule 401 of the Federal Rules of Evidence. In making these rulings, the Court also considers the proffered testimony in light of Plaintiff's theory of the case, which is essentially that more detailed information needed to be disclosed regarding the potential for water infiltration into the substructures of the decks. The rulings on the motions to strike do not mean that the Court necessarily considers the information persuasive, or that it is essential to overcoming the motion for summary judgment, only that it will not be stricken.

Turning to the details of the motion to strike, Defendants first seek to strike paragraph 6 of the Declaration of  Joshua Benton (Dkt. 39), in which Mr. Benton opines that the conditions giving rise to moisture infiltration were present from the time the decks at Rockwood were built. Defendants assert that the testimony is conclusory and

MEMORANDUM DECISION AND ORDER  -  11

speculative. However, Mr. Benton's affidavit makes clear that his conclusion about the onset of deterioration was based on a lifetime of working with wood. Paragraph 6 therefore contains proper inferences made by an individual with the knowledge and expertise to make such an inferences. Similarly, Paragraph 13, which describes Mr. Benton's experiences regarding the extent and limits of city building inspections, is adequately based on his observation and knowledge of such inspections over the years.

Defendants' objections to Paragraphs 8, 9, & 11 of the Butch McFarland affidavit (Dkt. 40) are unavailing for similar reasons. In these portions of his affidavit, Mr. McFarland explains his belief that moisture intrusion in the Rockwood decks began prior to October 1, 2011, the date the sale closed. He also relates his conclusion that the vent or vents that had been installed in one deck–presumably to help address the problem of moisture intrusion–had been placed not by the current owners of the Rockwood complex, but by their predecessors. The matters related in these paragraphs are either based on Mr. McFarland's observations, or constitute reasonable inferences drawn from those observations. They are not, as Defendants argue, mere speculation. The objections that Defendants have raised to these paragraphs go to the weight these opinions may carry with a trier of fact, not to the question of their admissibility.

Next, the Court will deny Defendants' motion to strike Paragraph 14 of the Benton Declaration and Paragraph 17B of the Martinson Declaration. (Dkt. 43). The argument here is that any discussions regarding what it means to "seal" concrete decks with a product like Thompson's Water Seal are irrelevant because Plaintiffs never actually

MEMORANDUM DECISION AND ORDER  -  12

applied such a product to the concrete balcony decks at Rockwood Lodge. This argument lacks merit. At least as the case has been presented on this motion, the issue of what it meant to "seal" the decks is crucial. Defendants' own theory of the case hinges on the notion that they fully met their obligation to disclose all latent defects by informing the Plaintiffs of the potential for deck water penetration in the July 1, 2011 disclosure letter. (Defendant's Brief, Dkt. 29 at p. 5). Having asserted the July 1, 2011 disclosure letter as a defense, Defendants cannot then deny Plaintiffs the opportunity to explain how they interpreted that disclosure letter and the ways in which they believe it was inaccurate or misleading. This aspect of the motion to strike will therefore be denied.

The Court will also deny the requests to strike Paragraphs 17E of the Martinson Declaration. In this paragraph Mr. Martinson, a civil engineer, opines that the vent or vents installed underneath one of the balconies at Rockwood was installed for the purpose of airing out substructure that had been compromised by moisture intrusion. Contrary to Defendants' assertions, there need not be definitive evidence in the record, in the form of a work order or similar document, that establishes the exact date that the vent was installed in order for expert witnesses to testify about its purpose. For purposes of the present motion, the McFarland Declaration is sufficient to establish that this vent was *not* placed by the Plaintiffs. The bulk of Mr. Martinson's affidavit also makes clear that he has the qualifications and background necessary to give an opinion as to the reason why the vent was installed.

Finally, the Court will deny the request to strike paragraph 17G of the Martinson

MEMORANDUM DECISION AND ORDER  -  13

Declaration, in which Mr. Martinson opines that the potential for water infiltration into the deck substructures was present from the time the decks were constructed. Defendants base their objection to this testimony on their assertion that there were no visible signs of water damage on the decks at Rockwood at the time of sale. The Court finds this argument somewhat disingenuous, given that this portion of Martinson's affidavit opines only as to when *internal* damage to the wooden substructures likely began, and does not discuss external or visible damage at all. Defendants' arguments raise issues that at best, may be appropriate areas for cross-examination, but that do not affect the overall admissibility of the testimony.

### III.    Motion for Summary Judgment

Turning to the substance of the motion, the Court concludes that Plaintiffs have raised genuine issues of material fact with respect to whether Defendants knew of the potential for water penetration in the decks at the Rockwood Complex prior to the closing on October 1, 2011, and as to whether Defendants adequately disclosed those potential problems to the Plaintiffs. Therefore, as will be discussed in more detail below, the fraud-based claims pled in Counts III and IV of the Amended Complaint survive summary judgment. However, Count I, for a breach of the implied covenant of good faith and fair dealing, and Count II, for failure to warn, will both be dismissed, because these causes of action are not applicable in this context.

### A. Breach of Contract/Implied Covenant of Good Faith and Fair Dealing

The Court will first address Count I of the Amended Complaint. Though this claim

MEMORANDUM DECISION AND ORDER  -  14

is entitled "breach of contract," it has been pled exclusively as a breach of the covenant of good faith and fair dealing. The Amended Complaint points to no specific provision of the Purchase and Sale Agreement that Plaintiffs claim was breached, a fact which Defendants point out in their moving papers and which Plaintiffs do not challenge. (Defendant's Memorandum, Dkt. 29, p. 4, and Plaintiff's Memorandum, Dkt. 32). Further, the Plaintiffs' summary judgment briefing provides scant argument on the issue of whether Defendants breached an express provision of the contract, and in any case, a party cannot oppose summary judgment by raising grounds not at issue under the pleadings. *Wasco Products, Inc. v. Southwall Technologies, Inc.,* 435 F.3d 989, 991 (2006); *Nissenbaum v. NNH Cal Neva Services Co., LLC,* 983 F.Supp.2d 1234, 1244 (D. Nevada 2013). For these reasons, the sole question the Court will consider with respect to Count I is whether Plaintiffs have raised a genuine issue of material fact on the implied covenant of good faith and fair dealing.

In Idaho, the covenant of good faith and fair dealing is an implied term in every contract. *Idaho First. Nat. Bank v. Bliss Valley Foods,* 121 Idaho 266, 288 (1991). A violation of the covenant occurs when one party to the contract "violates, nullifies, or significantly impairs any benefit of the contract." *Id.* While the covenant requires that "the parties perform in good faith the obligations imposed by their agreement," it cannot impose upon the contracting parties obligations that are inconsistent with the express terms of their agreement. *Id.* Nor does it impose an "amorphous concept of bad faith as the standard for determining whether the covenant has been breached." *Id.* at 628.

MEMORANDUM DECISION AND ORDER  -  15

Though the implied covenant of good faith and fair dealing is somewhat elusive conceptually, claims for breach of the covenant typically lie where one party relies upon a hyper-technical interpretation of an express contract term in a way that impairs or undermines another provision of the agreement, or the overarching purpose of the agreement. As one commentator has explained:

> The implied covenant of good faith and fair dealing is the residual gap-filling default rule of contract law. It imposes limits upon one contracting party's ability to negatively impact the contract's value to the other contracting party. It determines when a party may no longer pursue his own self-interest but must instead engage in cooperative behavior by deferring to the other party's contractual interests."

Thomas Diamond and Howard Foss, *Proposed Standards for Evaluating When the Covenant of Good Faith and Fair Dealing Has Been Violated: A Framework for Resolving the Mystery*, 47 HASTINGS L.J. 585, 586 (1996). "Thus, a party who evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party, may be liable for breach of the implied covenant of good faith and fair dealing." 23 Williston on Contracts § 63:22 (4th ed.).

A review of the principal Idaho cases on the covenant of good faith and fair dealing suggest that the views of these treatises are consistent with Idaho's application of the doctrine. In *Metcalf v. Intermountain Gas Co.,* 116 Idaho 622, 629 (1989), an employee who had taken substantial sick leave had her hours reduced by her employer. When she sued, arguing that the employer could not take adverse employment actions against her because of taking sick leave, the employer asserted that the at-will nature of

MEMORANDUM DECISION AND ORDER  -  16

her employment gave it the right to reduce her hours for any reason whatsoever. *Id.* at 623. The Idaho Supreme Court, however, held that the at-will nature of the employment relationship could not be used to defeat other provisions of the employment contract, such as a promise that a certain amount of sick leave would be available. Similarly, in *Sorensen v. Comm-Tek, Inc.,* 118 Idaho 664 (1990), Sorensen, a long term employee of a Boise-based company, agreed to accept a new position in the Washington, D.C. area. Because Sorensen had expressed concerns over the increased cost of living in the D.C. area, Comm-Tek assured him that if he accepted the position, he would receive a cost of living increase and a raise, the details of which would be worked out later. Sorensen accepted the position in reliance on this promise, but two months later the details of the salary increase had still not been worked out. When he sent a written proposal to his employer in an attempt to resolve the issue, he was promptly fired. *Id.* at 665-666. The employer argued that since Sorenson had always been an at-will employee, he could be terminated for any reason at all. On these facts, the Idaho Supreme Court remanded the case to the district court for consideration of whether the implied covenant had been breached. *Id.* at 669-670.

   Given the factual underpinnings of cases where a violation of the implied covenant of good faith and fair dealing has been found, the covenant is a poor conceptual fit with the facts of the present case. Rather, as will be discussed below, the facts of the present case support a claim for fraud, and they also–perhaps–might have supported a claim for a breach of an express contractual provision, had that cause of action been pled. The

MEMORANDUM DECISION AND ORDER  -  17

implied covenant, however, is intended to provide a remedy against different kinds of conduct than either a breach of an express contractual provision or fraud. If the covenant of good faith and fair dealing is simply a "gap filler" that prevents one party from evading the spirit of the bargain at the expense of the other, it is not necessarily co-extensive with the question of whether a party behaved in an honest manner. This distinction is implicit in the *Metcalf* decision, in which the Idaho Supreme Court rejected an "amorphous concept of bad faith" as a standard for determining whether the covenant of good faith and fair dealing had been breached. And indeed, if the covenant of good faith and fair dealing applied every time one party to a contract felt the other party had not dealt with them honestly, it would never be necessary to establish all the elements of fraud by clear and convincing evidence.

For these reasons, the Court concludes that the covenant of good faith and fair dealing simply does not apply to the situation presented in this case. Count I will therefore be dismissed in its entirety.

### B.      Fraud and Fraudulent Concealment (Counts III and IV).

Next, the Court concludes that Plaintiffs have established genuine issues of material fact with respect to their claims for fraud and fraudulent concealment.

In Idaho, fraud consists of "(1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury." *Washington*

MEMORANDUM DECISION AND ORDER  -  18

*Federal Sav. v. Van Engelen,* 53 Idaho 648, 657 (Idaho 2012). Though one of the essential elements of fraud is a false statement of fact, the question of whether a *failure to speak* may also give rise to a fraud based claim has also been extensively explored in Idaho Supreme Court opinions. As a result, Idaho courts have long recognized a cause of action, often called "fraudulent concealment" but also known as "fraud by silence" or "non-disclosure" that may apply to situations where there has been no affirmative misstatement of fact. *See, e.g. Tusch Enterprises v. Coffin,* 113 Idaho 37 (1987). Though the terminology varies, the legal rules that govern this species of fraud are clear. These rules will be discussed in detail below, but essentially, the governing principle is that silence may constitute fraud when some kind of duty to speak exists. In such cases, the question of whether a defendant had a duty to speak effectively replaces the first two elements of a traditional fraud cause of action.

The Idaho Supreme Court has frequently had occasion to address fraudulent concealment claims involving latent defects in real property that a buyer discovers after the time of sale. In one of the most recent cases, *Printcraft v. Sunnyside Park Utilities Co.,* 283 P.3d 757 (2012), the plaintiff printing business leased property in the defendants' industrial park and alleged that defendants had failed to disclose limitations on the sewage system that rendered plaintiff incapable of properly disposing of printing chemicals and other byproducts of the plaintiff's business. *Id.* at 762. The Idaho Supreme Court held that because there was evidence that defendants were aware of the nature of plaintiff's printing business and the importance of proper waste disposal facilities, and

MEMORANDUM DECISION AND ORDER - 19

because the plaintiffs did not know of the limitations on the defendant's system, a reasonable jury could have found for the plaintiffs on their fraudulent concealment claim. Relying on principles articulated in earlier cases, the court held that a duty to disclose arises in the following situations:

> (1) if there is a fiduciary or other similar relation of trust and confidence between the two parties; (2) in order to prevent a partial statement of the facts from being misleading; or (3) if a fact known by one party and not the other is so vital that if the mistake were mutual the contract would be voidable, and the party knowing the fact also knows that the other does not know it.

*Id.* at 769. *See also, Sowards v. Rathbun,* 8 P.3d 1245 (Idaho 2000)*; Bethlahmy v. Bechtel,* 415 P.2d 698 (Idaho 1966).

### 1.    Fraudulent Concealment

Turning to the facts of the present case, the Court concludes that Plaintiffs have established that genuine issues of fact exist on the claims for fraud and fraudulent concealment. The Court will first address the claim for fraudulent concealment, because that is the theory to which Plaintiffs devote the bulk of their briefing.

Plaintiffs do not argue that the Defendants owed them a fiduciary duty under the framework discussed in *Bethlahmy, Sowards,* and *Printcraft.* However, they do argue that Defendants owed them a duty to speak in order to prevent a partial statement of the facts (the July 1, 2011 disclosure letter) from being misleading. (Plaintiff's Brief at p. 14). The Court agrees that there are genuine issues of material fact as to this version of fraudulent concealment. Making all reasonable inferences in favor of Plaintiffs, it is possible to

MEMORANDUM DECISION AND ORDER  -  20

conclude that the July 1, 2011 letter amounted to only a partial statement of facts. A reasonable jury could conclude that the letter was misleading because it made what was in actuality a major capital repair project sound like an issue of routine maintenance.

It is true, as Defendants argue, that certain other factors may cut against a finding of fraud. Such factors include the fact that the decks at Rockwood Lodge appeared to be in fine condition prior to sale, and the relative smallness of the repair project undertaken at Adirondack Lodge in light of the complex's overall operating budget. This case also presents a somewhat novel situation because Defendants' alleged knowledge of the latent defect arises from their familiarity with defects at Adirondack Lodge, a different property in a different town, rather than with problems that had been identified at the Rockwood Complex itself. However, the Court sees no reason why the admitted novelty of the situation should preclude a fraud claim as a matter of law, particularly where there is evidence that the two apartment complexes were in many respects identical, and that even though located in different communities, the communities were in relatively close geographic proximity and relatively similar climate zones. All these issues go to the strength of the Plaintiff's claims, not to whether they should be submitted to a jury in the first place.

However, the Court concludes that Plaintiffs have *not* established genuine issues of material fact with respect to the third avenue for proving fraudulent concealment articulated in *Sowards, Bethlahmy,* and *Printcraft*. To restate that test, a party can establish a claim for fraudulent concealment "if a fact known by one party and not the other is so

MEMORANDUM DECISION AND ORDER  -  21

vital that if the mistake were mutual the contract would be voidable, and the party

knowing the fact also knows that the other does not know it." *Printcraft,* 283 P.2d at 769.

Plaintiffs have submitted evidence suggesting that Defendants were aware of the potential

for water penetration in the substructures of the decks at Rockwood, and have also

submitted evidence that they themselves had no reason to be aware of these problems.

However, Plaintiffs have not even attempted to argue that the problems were of such a

magnitude that a mutual mistake about the decks would have rendered the entire contract

voidable.

    In this context, the word "voidable," suggests something going beyond simple

"materiality." Idaho Courts have declared contracts voidable only in very limited

situations, such as where an insurer enters into a contract when it is not authorized to do

business in the state. See, e.g., *Messerli v. Monarch Memory Gardens, Inc.,* 397 P.2d 34

(1964); *Crnkovich v. Columbus Life Ins. Co.*, 118 P.3d 153, (Idaho Ct. App. 2001)

(same). These examples suggest that in order for a contract to be voidable, the mistake

must be of such magnitude that it goes to the very heart of the bargain being struck by the

parties. It cannot mean that every unexpected expense a buyer might encounter after

closing can give rise to a claim for fraudulent concealment, even if that expense turns out

to be quite significant. To hold otherwise would be to eviscerate the general rule of *caveat

emptor* and open the floodgates to fraud claims in every instance where a buyer might

encounter an unexpected expense after closing. However, the Idaho Supreme Court has

been quite clear that situations in which an individual may be found liable for fraud

MEMORANDUM DECISION AND ORDER  -  22

remain exceptions, not the rule.

### 2.    Standard Fraud Claim

Plaintiffs also have submitted enough evidence to overcome summary judgment on the standard fraud claim.  Read in the light most favorable to the Plaintiffs, the July 1, 2011 letter may be said to constitute an affirmative misrepresentation of fact for purposes of overcoming summary judgment as to the first two elements of a standard fraud claim. There are also issues of fact on the remaining elements of fraud, which would be applicable to either cause of action. Briefly, the evidence creating an issue of fact as to those elements is as follows.

• Materiality. Under Idaho law, the element of materiality may be satisfied by either a subjective or objective test. The objective test is satisfied if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Watts v. Krebs,* 131 Idaho 616, 619-620 (1998) (quoting Restatement (Second) of Torts § 538(2) (1977)).The subjective test is satisfied if "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." *Id.*

Here, there is evidence in the record that the physical integrity of the deck substructures was a material element in the transaction. Invoices from February through September of 2011 show that Defendants spent many thousands of dollars on repairing

MEMORANDUM DECISION AND ORDER  -  23

the decks at Adirondack in the months prior to the time the Rockwood sale closed.[3] (Dkt. 34-6). A reasonable jury might also infer that the Wolff Company's decision to back out of purchasing Adirondack Lodge was in large part due to the problems with the decks at that complex. And finally, there is the fact that at least one of the rotting wooden substructures at Rockwood Lodge collapsed, very nearly injuring a Rockwood maintenance worker. These factors–both the expense of repairing the decks and the risk to human safety that resulted when the problems went unchecked–suggest that a reasonable jury could conclude that misrepresenting the condition of the decks or the potential for water penetration was material to the transaction. These problems may not have been so extensive as to render the whole transaction voidable, but they were not of *de minimis* importance either.

• The speaker's knowledge of the statement's falsity and intent that there be reliance. The elements of knowledge and intent to rely can be proved by circumstantial evidence. *See, e.g. DBSI/TRI v. Bender,* 130 Idaho 796, (2004); *Idaho State Tax Comm'n. v. Hautzinger,* 137 Idaho 401, 409 (2002). Relevant evidence creating an issue of fact on these elements includes: 1) Plaintiffs' proof suggesting that someone placed a vent or vents in one of the Rockwood decks prior to closing; 2) the similarity of the overall design of the decks at Rockwood and Adirondack Lodge; 3) the expense incurred repairing the decks at Adirondack prior to closing 3) the Wolff Company's decision to

---

[3]The parties disagree about how much money was spent on repairing the Adirondack decks. However, such a dispute simply adds to the issues of fact that exist concerning the remaining claims.

MEMORANDUM DECISION AND ORDER  -  24

back out of the Adirondack transaction and 4) the July 1, 2011 letter itself.

•The hearer's ignorance of the falsity of the statement and reliance by the hearer. The declaration of Winnie Long explains that she was unaware of any problems with the decks at Rockwood Lodge. (Long Decl., Dkt. 41, at ¶¶ 3-5). In her deposition, Ms. Long also explained that she understood the recommendation in the July 1, 2011 letter that the decks be "sealed" to mean that the matter was an issue of routine maintenance. (Long depo., Dkt. 31-5, p. 9; *See also* Burton depo., Dkt. 34-5 at p. 15). Ms. Long's declaration also explains that she relied on the sellers to disclose any concealed defects with the property. (Long Decl. at ¶ 13). This evidence is sufficient to create a genuine issue of fact on the elements of ignorance and reliance.

• Justifiable reliance. Plaintiffs establish issues of fact on this element through Ms. Long's Declaration, and also through the declaration of Phillip Martinson, who explained why the Plaintiffs would not have considered it necessary to conduct destructive testing on the decks as part of their due diligence efforts. (Dkt. 43 at ¶ 4).This evidence, together with Mr. Martinson's explanation of the norms that apply to inspection of commercial properties prior to sale, is sufficient to create an issue of fact on the question of justifiable reliance.

• Resultant injury. Plaintiffs have asserted that their damages include the cost to repair or replace the decks, lost income from tenant concessions, and reduced marketability of the apartments due to the failing decks. (Amended Complaint ¶ 7.11). There does not appear to be a legitimate dispute that factual questions exist on the

MEMORANDUM DECISION AND ORDER - 25

element of damages.

For all these reasons, Plaintiffs claims for fraud and fraudulent concealment survive.

### C.    Failure to Warn (Count II)

Finally, the Court will also dismiss Plaintiff's claim for "failure to warn" (Count II of the Amended Complaint).

In seeking to dismiss Count II, Defendants argue that a claim for failure to warn cannot lie in this case, because 1) no known dangerous condition existed at the time of sale, 2) the potential for deck water penetration was appropriately disclosed to Plaintiffs, and 3) no physical injury to any person or property occurred, other than the damage to the decks themselves. (Defendant's Opening Brief at p. 6). While the Court disagrees with the first of these two propositions, it does agree that a physical injury is an essential element of a claim for "failure to warn" as that tort has been described by Idaho's appellate courts.

To some extent, the parties' disagreement over the parameters of the "failure to warn" tort may boil down to an issue of semantics. Though it is difficult to tell from either the Amended Complaint or the briefing, Plaintiffs' claim for "failure to warn" may simply be another term for fraudulent concealment, i.e. that species of fraud that is not dependent upon an *affirmative* misstatement of fact. If this is the case, and if Plaintiffs are simply arguing that no physical injury requirement is necessary in order to prove a fraud-based claim, they are correct. However, to the extent that Plaintiffs are seeking to bring a

MEMORANDUM DECISION AND ORDER  -  26

separate cause of action based in negligence, their claim for failure to warn must be dismissed.[4] The reason for this is that some physical injury–either to individuals or property *other than* the property that was the subject of the underlying sale–is an essential element of any claim based in negligence.

While the Idaho Supreme Court has not spoken directly to the issues raised by the briefing in this case, it is nonetheless possible to discern a pattern from the various cases involving latent defects in real property. In cases where no physical injury results from the allegedly dangerous latent defect, a plaintiff still has a cause of action, if he or she can prove fraud or fraudulent concealment by any of the means discussed above. That this is the case is apparent from the discussions in *Behtlahmy, Sowards,* and *Printcraft,* none of which involved physical injuries. If on the other hand a physical injury *is* involved, a plaintiff need not prove fraud by clear or convincing evidence, but instead may resort to negligence-based principles in order to obtain compensation for his or her injuries.

The principal case on this issue is *Barab v. Plumleigh,* 853 P.2d 635 (Ct. App. 1993). In that case, the plaintiff was seriously injured when a log lighting device in a wood stove fed by a propane line exploded. The plaintiff sued the sellers of the house, alleging not fraud, but negligence in the design and construction of the log lighting device, and also negligent failure to warn. *Id.* at 637. In addressing the claim for failure to warn, the Court of Appeals observed:

---

[4] In Count IV of the Amended Complaint Plaintiffs assert that Defendants "knew or reasonably should have known" of the hidden defects in the Rockwood decks, suggests that Plaintiffs did intend to plead "failure to warn" as a negligence-based cause of action.

> The general rule is that the vendor of real property who parts with title, possession, and control of the property is permitted to shift all responsibility for the condition of the land to the purchaser. . . . Under this rule, known as the doctrine of caveat emptor, the vendor is not liable for any harm resulting to the purchaser or others from any defects existing at the time of transfer. However, concerns for human safety and the need for improved bargaining ethics have led courts and commentators to recognize limited exceptions to this once universal doctrine. The relevant exception here is that a vendor has a duty to disclose an unreasonably dangerous condition existing on the property.

*Id.* (citing Prosser and Keeton on Torts § 64 at 446-47 (5th ed. 1984)). The Court went on to quote with approval both Prosser and Keeton and section 353 of the Second Restatement of Torts, and in so doing, established the parameters of the tort known as "negligent failure to warn" as it applies in the real property context. Stated simply, this tort recognizes that a vendor of land is under a duty to disclose to a buyer hidden defects in property, if the vendor knows or should know that they may present an unreasonable risk of physical harm.

Whether Plaintiffs can sustain a claim for failure to warn therefore turns on the meaning of the "physical harm" requirement expressed in the Restatement, in Prosser and Keeton, and in the *Plumleigh* case, because–fortunately–the Plaintiffs discovered that the decks at Rockwood were deteriorating before anyone was injured. It is true that Bruce McFarland *could have been* injured when he was inspecting one of the decks and the concrete above him gave way, and Plaintiffs attempt to argue that this incident satisfies the "physical harm" requirement. This argument is unavailing, however, because generally speaking, the common law of negligence does not compensate "close calls."

MEMORANDUM DECISION AND ORDER  -  28

Therefore, the only question that remains is whether, as Plaintiffs somewhat half-heartedly argue, the physical harm requirement may be met by the collapse of the deck structure itself.

The answer to this question is no. Even though not specifically addressed by Idaho courts in deciding a claim for failure to warn arising under Section 353 of the Restatement, Idaho courts have refused to allow recovery in negligence where a plaintiff's injuries consist of purely economic losses. "Economic loss" includes the "costs of repair and replacement of defective property which is the subject of the transaction, as well as commercial loss for inadequate value and consequent loss of profits or use." *Aardema v. U.S. Dairy Systems, Inc.,* 215 P.3d 505, 510 (2009); *Duffin v. Idaho Crop. Imp. Assn.* 126 Idaho 1003 (1995); *See also, Clark v. Int'l Harvester Co.,* 199 Idaho 326, 323 (1978). Here however, Plaintiffs have alleged no physical injury or property damage, other than the damage to the faulty decks themselves. Remedy for such losses lies in contract, or, if provable, in fraud.

For all these reasons, Count II of the Amended Complaint will be dismissed. The fraud-based claims survive, but Plaintiffs may not obtain recovery for their damages under negligence theories or negligence based principles–for example, by arguing that Defendants "should have known" about the defects in the decks at Rockwood Lodge. Dismissal of the breach of contract claim and the failure to warn claim also means that Plaintiffs must prove their remaining claims by clear and convincing evidence.

### D.  Attribution of Knowledge to Plaintiffs

MEMORANDUM DECISION AND ORDER  -  29

Finally, in footnote one of their opening brief, Defendants' argue that the notice to Plaintiff's real estate agent, Wayne Burton, about the potential for deck water penetration was legally sufficient to inform the Plaintiffs themselves of these problems. Because there are issues of fact surrounding the adequacy of the disclosure letter, the question of whether Mr. Burton adequately conveyed that information to the Plaintiffs need not be addressed at this time.

## ORDER

1. For all the foregoing reasons, Defendant's Motion for Summary Judgment (Dkt. 28) is **GRANTED IN PART AND DENIED IN PART.**  Counts I and Count II, for breach of contract and failure to warn, are hereby **DISMISSED**, with prejudice**.** The claims for fraud and fraudulent concealment (Counts III and IV) survive.

2. Defendants' Motion to Strike the Declaration of Keith Phillips (Dkt. 47) is **GRANTED.**

3. The Motion to Strike (Dkt. 48) portions of the Benton, McFarland, and Martinson Declarations is **DENIED.**

**IT IS SO ORDERED.**

DATED:  **January 26, 2016**

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge